UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
Civil Action No. 5:25-cv-26

| | | |
|---|---|---|
| OHIO SECURITY INSURANCE COMPANY and THE OHIO CASUALTY INSURANCE COMPANY, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **VERIFIED COMPLAINT** |
| UNITED FINISHING SYSTEMS, LLC and CROWN EQUIPMENT CORPORATION | ) ) ) ) | |
| Defendants. | ) ) ) ) | |
| _____ | ) | |

Ohio Security Insurance Company ("Ohio Security") and The Ohio Casualty Insurance Company ("Ohio Casualty") (collectively the "Insurers"), for their Complaint against United Finishing Systems, LLC ("UFS") and Crown Equipment Corporation ("Crown"), state as follows:

## NATURE OF THE ACTION

1.    The Insurers bring this action for declaratory relief pursuant to 28 U.S.C. §§ 2201, *et seq.*

2.    The Insurers seek a declaratory judgment concerning their rights and obligations under insurance policies issued by Ohio Security and Ohio Casualty to UFS in connection with the underlying action described herein.

## THE PARTIES

3.      Ohio Security is a corporation organized under the laws of the State of New Hampshire with its principal place of business in Massachusetts, and at all times relevant hereto was regularly conducting the business of insurance in the State of North Carolina.

4.      Ohio Casualty is a corporation organized under the laws of the State of New Hampshire with its principal place of business in Massachusetts, and at all times relevant hereto was regularly conducting the business of insurance in the State of North Carolina.

5.      UFS is a limited liability company organized and existing under the laws of the State of North Carolina with its principal place of business at 201 United Drive, in Statesville, North Carolina. Its statutory agent is Alwyn Moody III.

6.      Upon information and belief, UFS's members are Alwyn Moody III and William Anthony Brady, who are both citizens and residents of North Carolina.

7.      Crown is a corporation organized and existing under the laws of the State of Ohio with its principal place of business in New Bremen, Ohio.

8.      As the plaintiff in the underlying action described further herein, Crown has an interest in the outcome of this lawsuit.  The Insurers seek no affirmative relief from Crown other than to bind it to the outcome of this insurance coverage dispute.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

10.     Jurisdiction is appropriate because this is an action for declaratory judgment pursuant to 28 U.S.C. § 2201, and an actual case or controversy of a justiciable nature exists between the parties involving the rights and liabilities under insurance policies.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because this insurance coverage dispute arises from damages allegedly sustained as a result of events that occurred in this District.

## FACTS

## I.      THE UNDERLYING ACTION

12.     On May 10, 2023, Crown filed a Complaint against UFS and others in the United States District Court for the Western District of North Carolina captioned as *Crown Equipment Corporation v. David Brady, et al*, Civil Action No. 5:23-cv-00059 ("Underlying Action").

13.     A true and accurate copy of the Underlying Action is attached hereto as **Exhibit 1**.

14.     The Underlying Action arises out of a "finishing systems contractor abandoning a multi-million-dollar project to engineer and construct a powder coating system" for Crown. (Ex. 1, ¶1). Crown alleges a Pneu-Mech entity "failed to properly complete the project or fix its errors with the system." (Ex. 1, ¶1). Crown claims the

powder coating system damaged the surrounding facility and some of the system components. (Ex. 1, ¶1).

A. **The Parties in the Underlying Action**

15. Crown alleges in the Underlying Action that it manufactures, services, and sells material handling equipment, such as lift trucks, and related warehouse products. (Ex. 1, ¶6).

16. The Underlying Action names the following Defendants:

   a. David Brady;

   b. William Tucker;

   c. Joseph Boggs;

   d. Brawtus Holding Company, Inc. (f/k/a Pneu-Mech Systems Manufacturing, Inc.);

   e. Brawtus Management Company, LLC;

   f. Pneu-Mech Systems Manufacturing, LLC (k/n/a Pneu-Mech Dissolution, LLC);

   g. Pneu-Mech Systems Manufacturing, Inc.; and

   h. United Finishing Systems LLC.

17. The Underlying Action alleges Brawtus Holding Company, Inc. was originally incorporated in 1991 as Pneu-Mech Systems Manufacturing, Inc. and changed its name in March 2004 (Ex. 1, ¶¶18, 20, thereafter referenced as "Pneu-Mech 1.0"); that David Brady and William Tucker were executives and shareholders of Pneu-Mech 1.0 (Ex. 1, ¶18); that Pneu-Mech 1.0 "designed, fabricated, and installed paint finishing systems for commercial and industrial customers" (Ex. 1, ¶19); that as of 2001, Pneu-Mech 1.0 owned a building and property at 201 Pneu-Mech Drive

(k.n.a. 201 United Drive) (Ex. 1, p.3, n.1; ¶19); and that all of the other entity Defendants have this same location as their headquarters. (Ex. 1, ¶¶22, 23, 30, 48).

18.     The Underlying Action alleges that in March 2004, Brady formed Pneu-Mech Systems Manufacturing, LLC, with Pneu-Mech 1.0 as its sole member, and transferred Pneu-Mech 1.0's business activities to it (Ex. 1, ¶¶20-21, thereafter referenced as "Pneu-Mech 2.0"); and that at the same time, Brady formed Brawtus Management Company, LLC, with Pneu-Mech 1.0 as its sole member, and transferred Pneu-Mech 1.0's commercial property to it (Ex. 1, ¶¶23-24, thereafter referenced as "Brawtus Management").

19.     According to the Underlying Action, in early 2018, Pneu-Mech 2.0's assets were allegedly sold to employees James Andrews (President) and Jerry Trostle (Vice President of Sales) with Brady and Tucker functioning as their lender and landlord (Ex. 1, ¶¶25-30); the new entity was named Pneu-Mech Systems Manufacturing, Inc., which was the name of the original Pneu-Mech entity (Ex. 1, ¶28, thereafter referenced as "Pneu-Mech 3.0"); Pneu-Mech 3.0 performed the same business as Pneu-Mech 2.0, assumed its business obligations, used the same equipment, kept most of the same employees, and shared some of the same owners, directors and officers as a result of the asset transfer (Ex. 1, ¶33); Pneu-Mech 3.0's Board of Directors included Brady, Tucker, Andrews, Trostle and Boggs, who also served as Pneu-Mech 3.0's CFO (Ex. 1, ¶31); Joseph Boggs also serves as an accountant for Brady and Tucker's other companies and as accountant for UFS (Ex. 1, ¶¶31, 49.g.).

20.     The Underlying Action alleges the asset transfer to Pneu-Mech 3.0 was to defraud Pneu-Mech 2.0's creditors. (Ex. 1, ¶34).

21.     The Underlying Action alleges that in July 2022, Pneu-Mech 3.0 owed millions to creditors and was struggling to pay its note and lease (held by Brady and Tucker); that Trostle and Andrews explored selling Pneu-Mech 3.0 to a third party, but Brady and Tucker rejected the sale, defaulted the note, and took control of Pneu-Mech 3.0's assets (Ex. 1, ¶¶39-44); and that Brady and Tucker seized Pneu-Mech 3.0's assets to hide them from Crown (Ex. 1, ¶46).

22.     The Underlying Action alleges UFS registered as a North Carolina limited liability company a few days later, on August 1, 2022, with Alwyn Moody as President and William Brady (Brady's son) as Vice President (Ex. 1, ¶¶47, 49.a.); and that on the same day, UFS began operating at 201 Pneu-Mech Drive providing identical services as Pneu-Mech 3.0, having a nearly identical website, continuing Pneu-Mech 3.0's business, employing the same employees, and receiving Pneu-Mech 3.0's assets (Ex. 1, ¶¶48-50, 52, 54, 55, 95, thereafter referencing UFS as "Pneu-Mech 4.0").

### B.     Crown's Business and Contracts with Pneu-Mech 2.0 and Pneu-Mech 3.0

23.     Crown alleges it first did business with Pneu-Mech 2.0 in February 2015, and Boggs signed Crown's standard Terms and Conditions controlling all of Crown's purchases that include warranties of workmanship and indemnification provisions (Ex. 1, ¶¶56-57); that Pneu-Mech 2.0 also performed work for Crown in 2017 (Ex. 1, ¶60); that in 2018, Pneu-Mech 2.0 submitted another proposal that

Crown awarded; and that Crown was not aware and no one informed it that Pneu-Mech 2.0's assets had been transferred to Pneu-Mech 3.0 at that time. (Ex. 1, ¶¶61-63).

24.     Crown further alleges that from February to September 2018, Crown and Pneu-Mech 2.0 engaged in negotiations for an "engineering proposal" to engineer the powder coating system costing $1.5 million; that Crown awarded Pneu-Mech 2.0 the contract in October 2018 not knowing of the asset transfer; (Ex. 1, ¶¶75-68, referenced as the "Engineering Project" and "Engineering Contract"); that in January 2019, Pneu-Mech 2.0 submitted a proposal to construct the powder coating system costing over $15 million and Crown awarded Pneu-Mech 2.0 the contract in February 2019, not knowing of the asset transfer (Ex. 1, ¶¶69-72, referred to as the "Construction Project" and "Construction Contract"); and that the contracts for the Engineering Project and Construction Project are with Pneu-Mech 2.0, but the invoices are from Pneu-Mech 3.0. (Ex. 1, ¶¶62, 68, thereafter referencing Pneu-Mech 2.0 and Pneu-Mech 3.0 collectively as "Pneu-Mech").

## C.     Crown's Damages alleged in the Underlying Action

25.     The Underlying Action alleges that Pneu-Mech and its sub-contractors started work on the Construction Project in April 2019 (Ex. 1, ¶74); that "[i]n 2022, when Pneu-Mech and its subcontractors had substantially completed work under the Construction Contract except for work needing service, maintenance, correction, repair or replacement, Crown discovered problems with the completed work," including improper installation of the cure oven causing excessive heat to escape and

resulting physical damage to the Crown facility due to excessive heat from the cure oven (Ex. 1, ¶75); that the damage to the Crown facility allegedly included bursting sprinkler heads, sagging and leaking in water lines; charring of duct mastic; and deformation and separation of metal strapping across the oven (Ex. 1, ¶75.b.); and that the improperly installed cure oven "threatened to cause" additional physical damage to various components throughout the Crown facility. (Ex. 1, ¶75.c.; see also ¶¶111, 118).

26.     The Underlying Action alleges that during this same timeframe, Pneu-Mech was struggling financially and asked for a $330,000 payment in March 2022 despite all amounts due for the Engineering and Construction Contracts having been paid (Ex. 1, ¶76); that Crown and Pneu-Mech entered into an Addendum on June 7, 2022 covering Pneu-Mech "servicing, maintaining, correcting, repairing, replacing or otherwise fixing issues unrelated to the cure oven"(Ex. 1, ¶77); thatPneu-Mech acknowledged it could not correct the oven itself (Ex. 1, ¶77); that Pneu-Mech agreed in the Addendum that as part of "any sale of its assets or equity interests that the purchaser assume Pneu-Mech's full obligations under the Agreement" (Ex. 1, ¶80); that Pneu-Mech stopped working on the Project entirely in July 2022. (Ex. 1, ¶82).; and that, as a result, Crown hired a third-party contractor "[t]o prevent more damage to the Crown Facility and to correct and repair the cure oven so it would operate properly" (Ex. 1, ¶83).

27.     The Underlying Action alleges "Crown has incurred significant damages related to the correction of the cure oven and completion and repair of work covered

by the Engineering Contract, Construction Contract and Addendum." (Ex. 1, ¶84). Additionally, the complaint alleges a Pneu-Mech subcontractor filed a lien on the Crown facility in June 2022 for payments Pneu-Mech allegedly owed. (Ex. 1, ¶85).

**D.** **Crown's Causes of Action against UFS**

28.     The Underlying Action asserts 13 causes of action against all of the defendants. The causes of action against UFS are as follows.

29.     Count Nine is brought against UFS for Successor Liability under North Carolina and Federal Common Law as the successor to Pneu-Mech 3.0. Count Nine alleges UFS "assumed the liabilities and obligations of Pneu-Mech 3.0 ordinarily necessary for the uninterrupted continuation of normal business operations of Pneu-Mech 3.0." (Ex. 1, ¶¶193-202).

30.     Count Eleven is brought against all defendants, except Boggs, for fraudulent transfer in violation of the NCFTA. (Ex. 1, ¶¶212-221). The complaint alleges that under the NCFTA Crown is a creditor of UFS as successor to Pneu-Mech 3.0. and that UFS is a debtor. (Ex. 1, ¶213). It further alleges that UFS received the fraudulent transfers in bad faith. (Ex. 1, ¶220). For this count, Crown seeks "an Order for avoidance" of any transfer of assets made from Pneu-Mech 2.0 and Pneu-Mech 3.0 to UFS and "an Order enabling Crown to levy execution" on all such assets transferred. (Ex. 1, Prayer for Relief ¶¶ E, F).

31.     Count Thirteen is brought against all corporate entity defendants for the equitable remedy of piercing of the corporate form based on the alter ego/ single business enterprise doctrine/ instrumentality rule alleging all of the entities function as a single business enterprise. (Ex. 1, ¶¶234-239).

32.     Ohio Security is defending UFS in the Underlying Action under a full reservation of rights.

## II.     THE OHIO SECURITY POLICY

33.     Ohio Security issued to UFS a Commercial Package Policy bearing policy number BKS (23) 65 13 04 46, with effective dates of 8/11/2022 to 8/11/2023. The policy was renewed as policy number BKS (24) 65 13 04 46 for the policy period 8/11/2023 to 8/11/2024.  Both policies are identical in all material respects and are hereinafter collectively referred to as the "Primary Policy."

34.     A true and accurate copy of the 2022-2023 Primary Policy is attached hereto as **Exhibit 2**.

35.     A true and accurate copy of the 2023-2024 Primary Policy is attached hereto as **Exhibit 3**.

36.     Under **SECTION I – COVERAGES, COVERAGE A.   BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 1. Insuring Agreement,** paragraph **b.(1),** of the Commercial General Liability Form (CG 00 01 04 13) ("CGL Form"), the Primary Policy covers "property damage" caused by an "occurrence."

37.     The damages sought against UFS for the cost to repair or replace defective work are not for "property damage" caused by an "occurrence" within the meaning of the Primary Policy.

38.     To the extent the Underlying Action seeks mere economic damages, including, but not limited to damages for fraudulent transfer, it does not seek damages for "property damage" caused by an "occurrence" under the Primary Policy.

39.     The damages sought against UFS were either intentional or substantially certain to occur as a result of UFS's alleged conduct, and therefore they are not damages caused by an "occurrence" under the Primary Policy.

40.     Under **SECTION I – COVERAGES, COVERAGE A.   BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 1. Insuring Agreement,** paragraph **b.(2),** the Primary Policy covers "property damage" which "occurs during the policy period."

41.     To the extent any alleged, but denied, "property damage" sought in the Underlying Action occurred prior to the inception of the Primary Policy on August 11, 2022, no coverage exists for such damages under the Primary Policy.

42.     Under **SECTION I – COVERAGES, COVERAGE A.   BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 1. Insuring Agreement,** paragraphs **b.(3),** the Primary Policy covers "property damage" which "occurs during the policy period" only if, prior to the policy period, no insured listed under Paragraph **1.** of Section **II** - Who Is An Insured and no "employee" authorized by UFS to give or receive notice of an "occurrence" or claim, knew that the "property damage" had occurred, in whole or in part.

43.     To the extent that, prior to the inception of the Primary Policy on August 11, 2022, UFS 's members, managers, or certain others knew that any alleged "property damage" had occurred, in whole or in part, no coverage exists under the Primary Policy.

44.     Under **SECTION I – COVERAGES, COVERAGE A.   BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions,** paragraph **a**.,

**Expected Or Intended Injury**, the Primary Policy excludes coverage for "property damage" that was "expected or intended from the standpoint of the insured."

45. The damages sought against UFS in the Underlying Action were expected or should have been expected by UFS, and the damages are therefore excluded from coverage under Exclusion **2.a.** of the Primary Policy.

46. Under **SECTION I – COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions,** paragraph **b.**, **Contractual Liability**, the Primary Policy excludes coverage for damages the insured is obligated to pay "by reason of the assumption of liability in a contract or agreement."

47. The damages sought against UFS in the Underlying Action are damages that were allegedly assumed by UFS in a contract or agreement that is not an "insured contract" within the meaning of the Primary Policy and/or are for damage that occurred prior to the execution of the contract or agreement between UFS and Pneu-Mech 3.0, and therefore are excluded from coverage under Exclusion **2.b.** of the Primary Policy.

48. Under **SECTION I – COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, **2. Exclusions**, paragraph **k.**, **Damage to Your Product**, the Primary Policy excludes coverage for damages to "your product" arising out of it or any part of it.

49.     To the extent the damages sought against UFS in the Underlying Action are for damage to "your product" as defined in the Primary Policy, the damages are excluded from coverage under Exclusion **2.k.** of the Primary Policy.

50.     Under **SECTION I – COVERAGES, COVERAGE A.   BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, **2. Exclusions**, paragraph **l., Damage to Your Work**, the Primary Policy excludes coverage for damages to UFS's work, unless the work was performed by subcontractors.

51.     To the extent the damages sought against UFS in the Underlying Action are for damage to "your work" as defined in the Primary Policy, the damages are excluded from coverage under Exclusion **2.l.** of the Primary Policy.

## III.    THE OHIO CASUALTY UMBRELLA POLICY

52.     Ohio Casualty issued to UFS a Commercial Umbrella bearing policy number USO (23) 65 13 04 46, with effective dates of 8/11/2022 to 8/11/2023.   The policy was renewed as policy number USO (24) 65 13 04 46 for the policy period 8/11/2023 to 8/11/2024.   Both policies are identical in all material respects and are hereinafter collectively referred to as the "Umbrella Policy."

53.     A true and accurate copy of the 2022-2023 Umbrella Policy is attached hereto as **Exhibit 4**.

54.     A true and accurate copy of the 2023-2024 Umbrella Policy is attached hereto as **Exhibit 5**.

55.     Under **INSURING AGREEMENTS**, **SECTION I – COVERAGES,** paragraph **2.a.(1)**, of the Commercial Umbrella Coverage Form (CU 60 02 04 21)

("UMB Form"), the Umbrella Policy covers "property damage" which occurs during the "policy period."

56.     To the extent any alleged, but denied, "property damage" sought in the Underlying Action occurred prior to the inception of the Umbrella Policy on August 11, 2022, no coverage exists for such damages under the Umbrella Policy.

57.     Under **INSURING AGREEMENTS**, **SECTION I – COVERAGES**, paragraph **2.a.(2)** of the UMB Form, the Umbrella Policy covers "property damage" caused by an "occurrence."

58.     The damages sought against UFS for the cost to repair or replace defective work are not for "property damage" caused by an "occurrence" within the meaning of the Umbrella Policy.

59.     To the extent the Underlying Action seeks mere economic damages, including, but not limited to damages for fraudulent transfer, it does not seek damages for "property damage" caused by an "occurrence" under the Umbrella Policy.

60.     The damages sought against UFS were either intentional or substantially certain to occur as a result of UFS's alleged conduct, and therefore they are not damages caused by an "occurrence" under the Umbrella Policy.

61.     Under **INSURING AGREEMENTS**, **SECTION I – COVERAGES**, paragraph **2.a.(3)** of the UMB Form, the Umbrella Policy covers "property damage" which occurs during the "policy period" only if, prior to the "policy period", no insured listed under Paragraph **2.** of **Section II - Who Is An Insured** and no "employee"

authorized by UFS to give or receive notice of an "occurrence" or claim, knew that the "property damage" had occurred, in whole or in part.

62. To the extent that, prior to the inception of the Umbrella Policy on August 11, 2022, UFS 's members, managers, or certain others knew that any alleged "property damage" had occurred, in whole or in part, no coverage exists under the Umbrella Policy.

63. Under **SECTION V - EXCLUSIONS,** paragraph **4.**, **Contractual Liability**, in the UMB Form, the Umbrella Policy excludes coverage for "any liability assumed by any insured under any a contract or agreement."

64. The damages sought against UFS in the Underlying Action are damages that were allegedly assumed by UFS in a contract or agreement that is not an "insured contract" within the meaning of the Primary Policy and/or are for damage that occurred prior to the execution of the contract or agreement between UFS and Pneu-Mech 3.0, and therefore are excluded from coverage under Exclusion **4.** of the Umbrella Policy.

65. Under **SECTION V - EXCLUSIONS**, paragraph **7., Damage to Your Product**, in the UMB Form, the Umbrella Policy excludes coverage for damages to "your product" arising out of it or any part of it.

66. To the extent the damages sought against UFS in the Underlying Action are for damage to "your product" as defined in the Primary Policy, the damages are excluded from coverage under Exclusion **7.** of the Umbrella Policy.

67. Under **SECTION V - EXCLUSIONS**, paragraph **8., Damage to Your Work**, in the UMB Form, the Umbrella Policy excludes coverage for damages to UFS's work, unless the work was performed by subcontractors.

68. To the extent the damages sought against UFS in the Underlying Action are for damage to "your work" as defined in the Primary Policy, the damages are excluded from coverage under Exclusion **8.** of the Umbrella Policy.

69. Under **SECTION V - EXCLUSIONS,** paragraph **12.**, **Expected Or Intended Injury,** in the UMB Form, the Umbrella Policy excludes coverage for "property damage" that was "expected or intended from the standpoint of the insured."

70. The damages sought against UFS in the Underlying Action were expected or should have been expected by UFS, and the damages are therefore excluded from coverage under Exclusion **12.** of the Umbrella Policy.

71. The Umbrella Policy includes an **EXCLUSION – MANUFACTURERS ERRORS OR OMISSIONS** endorsement (CU 89 43 04 21), which modifies the UMB Form and provides in part:

**A.** The following exclusion is added to **Section V - Exclusions:**

**Manufacturers Errors or Omissions**

"Damages" arising out of any "manufacturer's error or omission".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured.

**B.** For the purposes of this endorsement, the following definitions are added to **Section VII - Definitions**:

**1.** "Damages" means any economic loss sustained by your customer because of the actual or alleged loss of use, of tangible property which has not been physically injured or destroyed, provided that such loss of use does not directly arise from any sudden and accidental physical injury to "your product".

**2.** "Manufacturer's error or omission" means an insured's negligent design, installation or manufacture of "your product" resulting in the failure of "your product" to perform the function or serve the purpose intended after it has left the possession of any insured.

72.     To the extent the damages sought against UFS in the Underlying Action are "damages" arising out of any "manufacturer's error or omission" as defined in the **EXCLUSION – MANUFACTURERS ERRORS OR OMISSIONS** endorsement, such damages are excluded from coverage.

## FIRST CLAIM FOR RELIEF:  DECLARATORY JUDGMENT

73.     The allegations contained in the previous paragraphs of this Complaint are re-alleged and incorporated herein by reference.

74.     Upon information and belief, UFS contends it is entitled to a defense and indemnification under the Primary Policy and/or the Umbrella Policy for the damages sought against UFS in the Underlying Action.

75.     The Insurers contend they are entitled to a declaration from this Court that the Primary Policy and the Umbrella Policy afford no coverage for any damages sought or awarded against UFS in the Underlying Action; that the Insurers have no duty to defend or to indemnify UFS for any settlement, damages, judgment, interest, costs or any other relief sought or obtained against UFS in the Underlying Action;

and that Ohio Security is entitled to withdraw its defense of UFS in the Underlying Action.

76.     A real and justiciable controversy exists between the Insurers and UFS necessitating judicial determination of the rights and responsibilities of the Insurers under the Primary Policy and the Umbrella Policy.

WHEREFORE, the Insurers pray for the following relief:

1.     That the Court declare that UFS is not entitled to indemnity under the Policy for any settlement, damages, judgment, interest, costs or any other relief sought or obtained against UFS in the Underlying Action.

2.     That the Court declare that the Insurers have no duty to defend UFS in the Underlying Action and that Ohio Security may withdraw its defense of UFS in the Underlying Action.

3.     That the Court declare and adjudicate all other rights and obligations between the parties under the Primary Policy and the Umbrella Policy;

4.     That the Insurers have and recover their costs in this action; and

5.     For such other and further equitable, legal and declaratory relief as the Court deems just and proper.

This the 26th day of February, 2025.

CRANFILL SUMNER LLP


BY:    /s/ Jennifer Addleton Welch
       Jennifer Addleton Welch
       N.C. State Bar No. 31360
       CRANFILL SUMNER LLP
       Post Office Box 27808
       Raleigh, North Carolina 27611-7808
       Phone:       (919) 828-5100
       Facsimile:   (919) 828-2277
       Email:  JWelch@cshlaw.com
       *Attorneys for Plaintiffs*

## VERIFICATION

_Kurt Schultz_ being first duly sworn, deposes and says that he/she is a _employee_ with Ohio Security Insurance Company; that he/she has read the foregoing "Verified Complaint for Declaratory Judgment" and knows the contents thereof; that the same is true of his/her own knowledge except as to those matters and things stated therein upon information and belief, and as to those he/she believes them to be true.

[insert name] _Kurt Schultz_

Subscribed and sworn to before me,

this _14_ day of _February_ 2025.

_____
NOTARY PUBLIC

My commission expires: _04/07/2028_

```
NETRA RAJ NEUPANE
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20164013421
MY COMMISSION EXPIRES 04/07/2028
```

## VERIFICATION

_Kurt Schultz_ being first duly sworn, deposes and says that he/she is a _employee_ with The Ohio Casualty Insurance Company; that he/she has read the foregoing "Verified Complaint for Declaratory Judgment" and knows the contents thereof; that the same is true of his/her own knowledge except as to those matters and things stated therein upon information and belief, and as to those he/she believes them to be true.

2/19/25

[insert name] _Kurt Schultz_

Subscribed and sworn to before me,

this _19_ day of _February_ 2025.

_Lalitha Siyal Mittulal_
NOTARY PUBLIC

LALITHA SIYAL MITTULAL
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20214009146
MY COMMISSION EXPIRES 03-15-2025

My commission expires: _03-15-2025_

4905-4234-8571, v. 1